# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**STANLEY A. SAMUEL,**

      **Petitioner,**

     v.                                          Case No. 03-C-1279

**MATTHEW FRANK,**

      **Respondent.**

## DECISION AND ORDER

Petitioner Stanley A. Samuel, a Wisconsin state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his Winnebago County Circuit Court conviction of second-degree sexual assault of a child, interference with child custody and abduction. Petitioner claims that his right to due process was denied because the trial court admitted in evidence out-of-court witness statements that were coerced and sentenced him based in part on sealed evidence to which he had no access.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The charges against petitioner arose out of his involvement with Tisha Leyh ("Tisha"). In January 1996, petitioner, then forty-seven and Tisha, then fifteen, left Wisconsin and spent the next thirteen months together. Winnebago County charged petitioner with interference with child custody and issued a warrant for his arrest and a capias – the equivalent of a warrant – for Tisha, who was a juvenile. On March 8, 1997, petitioner was arrested in Missouri. Petitioner waived extradition, and Tisha's father Peter Leyh ("Peter") and his girlfriend Catherine Stelzner ("Catherine"), drove to Missouri to pick up Tisha, who was nine months pregnant.

On March 10, 1997, Tisha gave birth to a daughter. On March 12, 1997, juvenile court and social service officials convened an intake conference to determine temporary placement of Tisha's daughter. A juvenile court intake worker, a social services staffer, Tisha, Peter, Catherine, Tisha's attorney David Keck, county social services sexual assault investigator Rodney Schraufnagel, and Oshkosh police officer Steven Sagmeister attended the conference. At the conference, the officials questioned Tisha about her and petitioner's activities over the preceding thirteen months. Tisha declined to answer many of the officials' questions. At the end of the conference, dissatisfied with Tisha's refusal to answer questions, Tisha's daughter was temporarily placed in foster care, and another placement conference was scheduled to take place two days later. The officials directed Tisha to address their questions in the meantime. They permitted Tisha to spend time with and breast-feed her daughter in the foster home.

On March 11, 1997, Tisha met with Schraufnagel and Sagmeister at the police department. Schraufnagel asked Tisha questions about her and petitioner's activities from the time they met until the present, and Tisha answered them. As a result, at the conference the next day, the officials placed the baby with Tisha. Subsequently, Tisha gave the officials two additional statements.

At petitioner's trial, petitioner argued that the state couldn't prove that he had sex with Tisha until after they left Wisconsin, and thus that he was guilty of committing sexual assault here. Tisha testified that she and petitioner did not have sex in Wisconsin. The state then introduced Tisha's statements to Schraufnagel and Sagmeister acknowledging that she had sex with petitioner in Winnebago County. The jury found petitioner guilty, and petitioner appealed. The state court of appeals reversed, holding that due process barred the admission of involuntary witness statements, and remanded for a determination concerning the voluntariness of Tisha's statements. State v. Samuel, 240 Wis. 2d 956 (Ct. App. 2000). The state supreme

court granted the state's petition for review and reversed the court of appeals. State v. Samuel, 252 Wis. 2d 26 (2002). The court adopted a new standard for determining the admissibility of allegedly coerced witness statements, holding that such statements were inadmissible only if they were involuntary <u>and</u> obtained by official conduct so egregious that they were unreliable as a matter of law. The court further determined that under such standard, Tisha's statements were admissible. Petitioner unsuccessfully petitioned for certiorari to the United States Supreme Court.

## II. TESTIMONY AT SUPPRESSION HEARING AND TRIAL

### A. Suppression Hearing

Prior to trial, petitioner moved to suppress Tisha's statements, and the circuit court held a hearing. Tisha testified that at the intake conference she was very fatigued because she had given birth two days previous and was heavily medicated. She testified that at the conference, officials questioned her mostly about her activities with petitioner, including where they had been for the past thirteen months and their sexual activities. Tisha testified that officials did not ask her about her relationship with petitioner before leaving Wisconsin. She testified that she refused to answer many of their questions, that they told her that if she did not cooperate she wouldn't be able to keep her baby, and that at the end of the conference, they decided that she "wasn't cooperating enough" and placed her baby in foster care. (Answer Ex. Q at 14.) She further stated that the officials instructed her to give a statement to Sagmeister before the next conference, scheduled two days later, though they did not tell her what to say. Tisha testified that she felt that she had to give a statement about petitioner to get her baby back. (Id. at 9-20.)

Tisha testified that she agreed to meet with Sagmeister and Schraufnagel the day after the intake conference at the police station in Oshkosh. She testified that Schraufnagel asked her about her activities with petitioner, from the time they met through the time that they traveled

-3-

together, and that about half the questions were open-ended. She stated that no one told her that she needed to implicate petitioner, but that Schraufnagel had previously told her father that she should say that she wanted to come home and that she had had sex with petitioner before they left town. Tisha testified that she gave Schraufnagel and Sagmeister incriminating information about petitioner because "they didn't like what I had to say in the first place at the intake conference." (Id. at 16.) She testified that after she gave a statement, officials returned her daughter to her. Tisha testified that Sagmeister and Schraufnagel asked her to give another statement because the recording of the statement she gave at the police station was inaudible. She further testified that they subsequently asked her for a written statement. Tisha testified that officials did not threaten or coerce her to get the additional statements, but she felt that if she didn't give them, she might lose her baby again. (Id. at 16-28.)

Tisha's father, Peter, also testified. He stated that at the intake conference, officials asked Tisha where she had been and with whom she had been associating and that she answered some questions and not others. Peter testified that the officials told Tisha to "cooperate." He testified that no one told her that she had to cooperate to keep the baby but that officials said that if she did not cooperate, they could not trust her. He testified that they became angry when Tisha refused to tell them where she and petitioner went and refused to give them addresses of people who they stayed with, and told Tisha they couldn't trust her with the baby because she could run away and take shelter with one of petitioner's friends. Peter testified that after the intake conference, Schraufnagel told him of the "areas of cooperation" that the police wanted: "in order to prosecute [petitioner] they needed to know where they were, where they had sex, where – who their friends were. . . who witnessed their activities." (Id. at 38-39.) He testified that he conveyed Schraufnagel's statements to Tisha. He testified that at the police station the next day, he did not hear anyone coach Tisha on what to say. (Id. at 33-40.)

-4-

David Keck, the attorney who represented Tisha at the intake conference, testified that most of the questions at the conference focused on petitioner, and that officials repeatedly told Tisha to cooperate. He stated that at one point the officials told Tisha to cooperate by meeting with Sagmeister after the conference. He testified that it was not clear whether this meeting would be related to petitioner's prosecution or not, but that it was his impression that in order to get her baby back, Tisha needed to give the officer a statement regarding the criminal prosecution of petitioner. However, he testified that he did not hear any threats. He testified that he attended the second conference, held the day after Tisha had given the police a statement and the officials returned Tisha's baby to her. (Id. at 46-48.)

Peter's girlfriend, Catherine, testified that she did not attend the whole intake conference, but that after the officials took Tisha's baby, she expressed anger to them. She further testified that an official told her that "if they saw some cooperation they would consider giving the baby back at a hearing on Friday." (Id. at 50.)

The state did not call any witnesses at the suppression hearing. The court denied petitioner's motion to suppress Tisha's statements, holding that he lacked standing to assert the objection. The court also indicated that in its view, officials had not coerced Tisha's statements.

**B.     Trial**

At the trial, Tisha denied having sex with petitioner before they left Oshkosh and, as she had at the suppression hearing, stated officials had coerced her statements to the contrary. The court admitted such statements, and the parties also presented evidence regarding their

-5-

voluntariness.[1] Tisha, Peter and Catherine testified generally as they had at the suppression hearing, with one notable exception. Peter testified that when officials gave Tisha her baby back, they said that they did so because Tisha had visited her baby at the foster home and "exhibited appropriate maternal behavior." (Answer Ex. T at 150.)

Sagmeister testified that he arrived late for the intake conference. He said that in responding to questions at the conference, Tisha was "cautious," "confused" and "vague," and that officials told her to "cooperate." (Id. at 55.) Sagmeister stated that at the end of the conference, officials told Tisha to contact Schraufnagel or himself before the next conference. (Id. at 56.) He testified that "juvenile court intake and social services" made the decision to place Tisha's baby in foster care and that the decision was unrelated to the police investigation of petitioner. (Id. at 16-17.) He testified that the officials instructed Tisha to speak with himself or Schraufnagel because "she was still on an outstanding capias" and may have been the victim of a crime. (Id. at 56.)

Sagmeister testified that he and Schraufnagel questioned Tisha at the police station the day after officials took her baby and did not tell her what information she should give them. He stated that Tisha's father was present for part of the time that he and Schraufnagel questioned Tisha, but that she said that she would be more comfortable talking about petitioner if her father

---

[1] Petitioner argues that in assessing the merits of his petition, I should only consider the testimony at the suppression hearing and not the testimony at trial. On direct appeal, a court generally examines the correctness of a particular ruling as of the time that it was made and according to the record before the lower court. 24 C.J.S. Criminal Law §1709, at 369 (1989). However, habeas corpus is an "extraordinary" writ, Calderon v. Coleman, 525 U.S. 141, 146 (1998), and a habeas court examines the entire record, United States v. Bolin, 514 F.2d 554, 557 (7th Cir. 1975) (stating that it is well-settled that "the validity of a search or arrest can be supported by evidence which was adduced at trial even though it was not presented at the pretrial suppression hearing"). Thus, I will consider the testimony presented both at the suppression hearing and at the trial.

left the room. Sagmeister stated that Schraufnagel asked most of the questions, and that they were primarily open-ended. (Id. at 17-19.)

Sagmeister testified that at the conference the next day, county officials, "based on the interview that we had with Tisha," returned the baby to Tisha. (Id. at 20.) He testified that at that conference he told Tisha that he needed her to make another statement because the audio recording had not come through, and that he and Schraufnagel met with Tisha later that afternoon for her to repeat her statement. Sagmeister testified that in giving a second statement, Tisha did not object to any of the questions asked and answered the questions in the same way that she had the previous day. He testified that he never told Tisha that she needed to say that she had sex with petitioner in Winnebago County prior to 1995, but that she gave him that information. He testified that, later, he and Schraufnagel went to Peter's home, where Tisha lived, and asked Tisha to repeat her statement in writing, which she did. (Id. at 20-22.)

Schraufnagel testified that Sagmeister brought him into the case when Tisha was in the hospital. He testified that he was concerned about Tisha and her child and not about prosecuting petitioner. He stated that he believed that Tisha and her baby should be kept together, and that the initial intake conference focused on whether Tisha could be "trusted with her baby" or if she would "run away again." (Id. at 73-74.) He testified that he told Tisha at the conference that she was a "victim." (Id. at 106.) He testified that no one asked Tisha about sex with petitioner, but officials did ask her whether petitioner was the father of her baby, and where Tisha and petitioner had been and what they had done for the past thirteen months. (Id. at 74-75, 109-10.) He testified that at one point in the conference Tisha denied that petitioner was the father, which caused concerns regarding health hazards and paternal rights. (Id. at 77.)

Schraufnagel stated that after the conference, Tisha only needed to talk with him about such things as prenatal care. Schraufnagel acknowledged that after the conference he talked

-7-

with Tisha's father but stated that he didn't tell him what Tisha needed to say, only that he should "talk with his daughter about the problems that he felt she was in." (Id. at 113-17.) His testimony about the questioning at the police station was generally the same as Sagmeister's.

The prosecution presented evidence besides Tisha's statements that petitioner and Tisha had sex before leaving Wisconsin. Three of Tisha's friends or acquaintances testified that before Tisha and petitioner left, Tisha told them that she and petitioner had sex. A cellmate of petitioner testified that petitioner told him that he had sex with Tisha long before leaving Wisconsin. Tisha's mother, Cindy, testified that before they left the state, petitioner drove Tisha to Planned Parenthood, a reproductive health care clinic. Tisha's sister testified that she had seen petitioner and Tisha lying in Tisha's bed underneath a blanket, and had seen them sitting on a bed in the back of petitioner's pick-up truck. One of Cindy's neighbors testified that she often saw petitioner's vehicle parked at Cindy's house at night after Cindy left for work.

As to the abduction and interference with custody charges against petitioner, Tisha testified that she did not run away, but was kicked out of Cindy's house after Tisha reported to state authorities that Cindy maintained her home in an unsanitary condition. She also testified that her father had indicated that she could not live with him. Cindy and Peter testified that they did not consent to Tisha's leaving town. Peter testified that he and Cindy contacted police soon after Tisha left and reported incoming calls from Tisha to the police. Two of Tisha's acquaintances testified that Tisha had spoken of running away.

I will discuss additional testimony in the course of the decision.

### III.  STANDARD

A federal court may grant habeas relief to a state prisoner who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(3) and 2254(a). Because petitioner filed his petition after the effective date of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), the AEDPA standard of review governs his claims. Ouska v. Cahill-Masching, 246 F.3d 1036, 1044 (7th Cir. 2001). AEDPA limits a federal court's authority to grant habeas relief to a person who is being unlawfully held in custody. Under AEDPA, I may grant relief only if the state court decision under review was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States"; involved an "unreasonable application" of such clearly established law, 28 U.S.C. § 2254(d)(1); or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

## IV. WITNESS STATEMENTS

Petitioner asserts that the admission of Tisha's out-of-court statements at his trial violated his Fourteenth Amendment right to due process. He argues that AEDPA does not bar relief because the Wisconsin Supreme Court's opinion finding otherwise both involved an unreasonable application of clearly established Supreme Court law, see § 2254(d)(1), and was based on an unreasonable determination of the facts in light of the evidence presented, see § 2254(d)(2).

**A. Application of Clearly Established Law**

A state court unreasonably applies Supreme Court precedent when it "'identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case'" or "'if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Dixon v. Snyder, 266 F.3d 693, 700 (7th Cir. 2001) (quoting Williams v. Taylor, 529 U.S. 362, 407 (2000)). "[A]n unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams, 529 U.S. at 409-10). Under the unreasonable application prong of the habeas statute,

-9-

"substantial deference is due state court determinations." Searcy v. Jaimet, 332 F.3d 1081, 1089 (7th Cir. 2003). Thus, I must uphold the state court decision if it is "at least minimally consistent with the facts and circumstances of the case . . . even if it is not well reasoned or fully reasoned, or even if it is one of several equally plausible outcomes." Id. (quoting Schaff v. Snyder, 190 F.3d 513, 523 (7th Cir. 1999)). However, the reasonableness standard is not ineffectual, and the federal courts should not defer in all cases to the state court's decision. Hall v. Washington, 106 F.3d 742, 748-49 (7th Cir. 1997).

The Supreme Court has clearly established that due process bars a court from admitting a criminal defendant's involuntary statements. See, e.g., Dickerson v. United States, 530 U.S. 428, 432-34 (2000); Jackson v. Denno, 378 U.S. 368, 385-86 (1964); Spano v. New York, 360 U.S. 315, 320-21 (1959). Petitioner argues that Tisha's statements were involuntary and that the Wisconsin Supreme Court unreasonably refused to extend to rule that a defendant's involuntary statements are inadmissible to a prosecution witness's involuntary statements. The reasoning of some Supreme Court cases suggests that it might be logical to extend the rule governing defendants' statements to witness statements. See, e.g., Colorado v. Connelly, 479 U.S. 157, 166 (1986) (stating that the reason for excluding involuntary admissions is to deter the police from engaging in coercive conduct in the future); United States v. Calandra, 414 U.S. 338, 355-64 (1974) (Brennan, J., dissenting) (stating that the exclusionary rule assures citizens that the government will not benefit from official lawlessness, and thereby encourages trust in government); see also United States v. Gonzales, 164 F.3d 1285, 1289 (10th Cir. 1999) (stating that the admission of coerced witness statements at trial violates the due process rights of the defendant).

However, I cannot say that the Wisconsin Supreme Court was unreasonable in refusing to extend the rule governing defendants' statements to witness statements and instead adopting

-10-

a rule permitting involuntary witness statements to be admitted as long as the State actors did not engage in egregious misconduct. In justification of its decision, the Wisconsin Supreme Court pointed out that the rule requiring the exclusion of involuntary admissions is based on several constitutional principles, not all of which apply to involuntary witness statements. The court noted, for example, that the rule requiring suppression of involuntary admissions was supported not only by due process considerations, but also by the Fifth Amendment right against self-incrimination, and that the latter right had no application in the case of a non-defendant. Samuel, 252 Wis. 2d at 39. The state supreme court also stated that "the idea that the government must produce evidence by its own independent labors rather than compelling it from the mouth of the accused does not seem to justify the suppression of statements by those other than the accused." Id.

Moreover, in determining whether to exclude an involuntary witness statement, some other courts have applied a more stringent standard than in the case of an involuntary defendant statement. See, e.g., United States v. Merkt, 764 F.2d 266, 275-76 (5th Cir. 1985) (concluding that even if law enforcement agents had improperly intimidated and coerced witnesses, the conduct was not so egregious as to require exclusion of the witnesses' statements as a prophylactic measure); United States v. Fredericks, 586 F.2d 470, 481 (5th Cir. 1978) (upholding admission of witness's statements when the police actions were "not the sort of third-degree physical or psychological coercion that might prompt the court to disregard the societal interest of law enforcement by excluding probative testimony"); see also United States v. Chiavala, 744 F.2d 1271, 1273 (7th Cir. 1984) (suggesting that due process rights are implicated when the government seeks to admit a witness statement obtained by extreme coercion or torture); Bradford v. Johnson, 354 F. Supp. 1331, 1335-37 (E.D. Mich. 1972) (stating that because statements were produced by torture, they should not have been admitted). The decisions of

-11-

these courts also support the notion that the rule adopted by the Wisconsin Supreme Court is not unreasonable. See Price v. Vincent, 538 U.S. 634, 643 n.2 (2003) (citing lower court cases to show that the state court's decision was not objectively unreasonable).

**B.     Determinations of Facts**

Section 2254(d)(2) permits a district court to issue a writ of habeas corpus to a prisoner in custody in violation of the Constitution where such prisoner can show that the state courts' factual determinations were objectively unreasonable in light of the evidence presented in the state-court proceeding.[2] Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  A habeas court may find a state court factual determination unreasonable where the state court failed to consider key aspects of the record, Miller-El, 537 U.S. at 346-47, where the determination is unsupported by the record, Taylor v. Maddox, 366 F.3d 992, 1008 (9th Cir. 2004), where the court's credibility determination is unreasonable, Miller-El, 537 U.S. at 340, or where the court relied on testimony of an individual who lacked personal knowledge of facts, Bui v. Haley, 321 F.3d 1304, 1315-16 (11th Cir. 2003).  Courts "may no more uphold such a factual determination than we may set aside reasonable state-court fact-finding." Taylor, 366 F.3d at 1008.

In the present case, petitioner argues that the facts unequivocally show that state officials took custody of Tisha's baby in order to coerce her to make incriminating statements about

---

[2]The circuits are split as to how exactly § 2254(d)(2) interacts with § 2254(e)(1), which provides that in a habeas proceeding, any state court factual determination is presumed to be correct, and a petitioner can only rebut this presumption by clear and convincing evidence. Lambert v. Blodgett, 393 F.3d 943, 972 n.19 (9th Cir. 2004) (describing the split and collecting cases).  The Seventh Circuit appears to treat § 2254(e)(1) as setting forth the standard for determining unreasonableness under § 2254(d)(2). Montgomery v. Uchtman, 426 F.3d 905, 912 (7th Cir. 2005) (stating that in order for a petitioner to prevail on a § 2254(d)(2) claim alleging that a state court's factual determination was unreasonable, she must offer clear and convincing evidence that the state court's determination was wrong).

-12-

petitioner.[3] The state supreme court rejected this characterization of the facts. And based on the evidence in the record, I cannot conclude that the state court's contrary factual determinations were "objectively unreasonable." See Miller-El, 537 U.S. at 340. There is evidence that county officials conducted the intake conference because they had legitimate concerns about placing the baby with Tisha. Tisha had been on the run for thirteen months with a man more than three times her age and was subject to an outstanding capias, and the officials knew nothing about what she had been doing. Thus, officials were concerned that Tisha might have been involved in activities relevant to whether the baby should be placed with her, such as crime and drug use. Officials were also concerned about the quality of Tisha's pre-natal care as well as her attitude toward motherhood and child care. Further, during the conference, Tisha denied that petitioner was the father of her baby. It was reasonable for the officials to be concerned about the implications of this statement.

And there is evidence that the officials at the intake conference limited their questions about petitioner to those relevant to these concerns. All witnesses, including Tisha, agreed that at the intake conference, the officials did not ask Tisha whether she had sex with petitioner prior to leaving Wisconsin. Schraufnagel went further, testifying that no one asked Tisha about sexual encounters between her and petitioner even while on the road, except to determine whether

---

[3]If petitioner's view of the facts was the only reasonable view, then the admission of Tisha's out-of-court statements in evidence would likely have violated petitioner's right to due process. See Dowling v. United States, 493 U.S. 342, 353 (1990) (stating that evidence must be excluded from a criminal trial if it was procured by actions violative of "the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency"); Turner v. Pennsylvania, 338 U.S. 62, 66 (1949) (assuming that the due process clause would be implicated by the admission of testimony coerced from a witness); Hysler v. Florida, 315 U.S. 411, 413 (1942) (same); United States v. Chiavala, 744 F.2d 1271, 1273 (7th Cir. 1984) (stating that due process rights are implicated when the government seeks to admit a witness statement obtained by extreme coercion such that the resulting trial was "fundamentally unfair" ); see also Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding that a threat to take a child is coercive).

petitioner was the father of Tisha's baby. Peter testified that officials asked Tisha for information about where and with whom she had been, and said that they could not trust Tisha with her baby if she had "the ability to leave here and run away and take shelter with a baby with one of [petitioner]'s friends . . ." (Answer Ex. Q at 36-38, 37.)

In addition, there is evidence in the record supporting the Wisconsin Supreme Court's finding that officials did not tell Tisha what to say. Peter testified that Schraufnagel told him only "areas of cooperation or information" in which the officials were interested, but that Tisha was not told "you need to say this or you won't get your baby back." (Id. at 38-41.) Schraufnagel testified similarly, stating that he spoke to Tisha's father about the trouble she was in "that she had potentially been a victim of one or more people; that she has a capias outstanding; that it remains to be seen whether she's been involved in any other illegal activities and in order to determine what's best for Tisha and what's best for the baby we need to have some sense of cooperation from Tisha to understand what's happened to her." (Answer Ex. T at 115-16.)

Further, to the extent that the state supreme court implicitly determined that the officials' decision to take temporary custody of Tisha's baby was not intended to serve as a threat, such determination was reasonable. Sagmeister testified that the police department had no role in the decision to take Tisha's baby and that the decision was unrelated to the investigation of petitioner. Supporting this contention, it appears from the record that the juvenile court intake worker was the primary questioner at the intake conference and that she made the decision to take Tisha's baby. Further, it appears from Schraufnagel's testimony that a court commissioner authorized social services to take temporary custody of Tisha's baby prior to the intake conference. (Answer Ex. T at 73.) As to the meeting with Sagmeister and Schraufnagel on March 13, Sagmeister testified that Tisha had been instructed to meet with him – a police officer – because she had to meet with him anyway to discuss her capias and whether she had been

-14-

Case 2:03-cv-01279-LA   Filed 12/19/06   Page 14 of 18   Document 33

the victim of a crime. It may well be that Sagmeister and Schraufnagel took advantage of the fact that social service employees instructed Tisha to speak with them by Friday, using the opportunity to ask questions that were irrelevant to custody. However, Schraufnagel testified that Tisha only needed to answer those questions relating to prenatal care and her risk of flight, and no one testified that Tisha resisted answering any of the questions or that anyone threatened Tisha at the station.

Only Tisha's testimony suggested that the officials engaged in an egregious, concerted effort to threaten her by wrongfully taking her baby. But the state court could have reasonably found that such testimony was not credible, as Tisha stated that she could not remember who threatened her or what they said exactly. In addition, Tisha testified that she loved petitioner, wanted to marry him and would do everything possible to protect him. (Answer Ex. S at 184.)

Under the deferential AEDPA standard, I cannot conclude that the state supreme court's factual determination was unreasonable. Therefore, I need not address whether the admission of Tisha's out-of-court statements was harmless error.

## V. SENTENCING

Petitioner also contends that he was denied due process at sentencing because, in imposing the sentence, the court relied on two sealed documents used in a "Children in Need of Protection or Services" ("CHIPS") proceeding for Tisha and on a transcript from the CHIPS proceeding to which petitioner had no access. At the sentencing hearing, the court stated:

> As to the seriousness [of the offense], the Court has heard testimony in another proceeding . . . the effect on [Tisha], whether she recognizes it or not, is substantial. And she will require long-term counseling, perhaps treatment in the future. She's been exposed to a criminal environment over a long period of time. There is testimony that she has considerable disrespect for authority, and certainly that exposure [to petitioner] can hardly be expected not to have increased that.

(Mot. to Expand Ex. 2 at 63-64.) In the present case, the Wisconsin Court of Appeals, the last state court to rule on this claim, did not base its decision on the merits of petitioner's arguments, but rather concluded that petitioner had waived review of this claim. In the present case, the parties agree that this waiver is not "independent of the federal ground and adequate to support the judgment," Moore v. Bryant, 295 F.3d 771, 775 (2002). (See Br. in Opp'n to Pet. at 33.) Thus, petitioner is not procedurally barred from asserting the claim that his due process rights were violated when the sentencing court relied on testimony and documents from a proceeding to which petitioner was not a party. See Perruquet v. Briley, 390 F.3d 505, 515 (2004) (explaining that the state can waive procedural default by intentionally relinquishing its right to assert that defense).[4] Because the state court relied solely on petitioner's waiver to dismiss this claim, there has been no determination "on the merits in State court proceedings" as described in 28 U.S.C. § 2254(d). As such, the more lenient standard prescribed in § 2254(a), whether petitioner is in custody in violation of the Constitution or laws of the United States, applies.

Thus I must consider the merits of the claim and, if a constitutional error was committed, whether the error was harmless, i.e. whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict'" or in the present case, the sentencing judge's decision. Aleman v. Sternes, 320 F.3d 687, 690-91 (7th Cir. 2003) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)). If I am convinced upon review of the entire record that the error did not influence the sentencing decision or had but slight effect, the sentence must

---

[4]Despite respondent's withdrawal of the procedural default defense, respondent still argues that petitioner waived his claim that his due process rights were violated by the sentencing court under federal waiver law. Essentially, respondent is seeking to import a federal procedural rule into my habeas review of a state court decision. However, during a habeas review, I rely on "state, not federal, procedural rules. Thus, a waiver on which the state court did not explicitly rely will not bar [my] review of the merits of a claim." DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005).

stand. Stewart v. Erwin, No. 1-03-201, 2005 U.S. Dist. LEXIS 26658, at *13-14 (S.D. Ohio Nov. 4, 2005). In contrast, if I am "left in grave doubt," I must find that the error had substantial influence on the sentence and cannot stand. Id. (citing Kotteakos v. United States, 328 U.S. 750, 765 (1946)); see also United States v. Patrick, 988 F.2d 641, 648 (6th Cir. 1993) (explaining that improprieties on the part of the sentencing judge are subject to review under harmless error analysis).

In the present case, regardless of whether the sentencing procedure violated petitioner's due process rights,[5] I cannot conclude that the documents relied on by the sentencing judge had a "substantial and injurious effect" on the sentencing judge's decision. See Aleman, 320 F.3d at 691 (explaining that "[u]nless its jurisdiction is at stake, a court may take up issues in whatever sequence seems best, given the nature of the parties' arguments and the interest in avoiding unnecessary constitutional decisions"). This is so because the two sealed documents used in the CHIPS proceeding and relied upon by the sentencing judge consisted of the psychological reports of Drs. Hauer and Kaplan. Petitioner clearly had access to these documents at the sentencing hearing and had the opportunity to rebut their conclusions. In fact, during the hearing, petitioner's attorney explicitly referred to both reports. (Mot. to Expand Ex. 2 at 47-48.)

Moreover, with respect to the testimony from the CHIPS proceeding, I have reviewed the transcript in camera and am convinced that because the testimony at issue was that of Dr. Hauer, the relevant portions of the testimony are merely cumulative of Dr. Hauer's psychological report and thus the sentencing judge's reliance upon them was harmless. See Patrick, 988 F.2d at 648 (explaining that a court's reliance on extra-record information was harmless because the information was cumulative of evidence in the record); see also Washington v. Smith, 219 F.3d

---

[5]It is clear that the sentencing process must satisfy the requirements of the due process clause. Gardner v. Florida, 430 U.S. 349, 358 (1977).

-17-

620, 634 (7th Cir. 2000) (stating that "[e]vidence is cumulative when it supports a fact established by existing evidence"). Thus, given that petitioner had access to the sealed documents relied upon by the sentencing judge and the fact that the testimony given in the CHIPS proceeding was cumulative of other evidence relied on by the sentencing judge, any constitutional error committed during sentencing was harmless.

## VI. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that petitioner's application for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 19th day of December, 2006.

        s/Lynn Adelman
        LYNN ADELMAN
        District Judge

-18-

Case 2:03-cv-01279-LA    Filed 12/19/06    Page 18 of 18    Document 33